**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 31, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

BLAYDE LYNN CROCKETT, also
known as Lewis Tremain,

        Defendant - Appellant.

No. 04-4204

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:02-CR-616-01-DAK)**

---

**Submitted on the briefs:**

James E. Rice and Ben Rice, Boise, Idaho, for Defendant-Appellant.

Alan Hechtkopf and John Hinton, III, Tax Division, Department of Justice,
Washington, D.C., for Plaintiff-Appellee.

---

Before **HENRY**, **McKAY**, and **EBEL**, Circuit Judges.

---

**McKAY** , Circuit Judge.

---

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f). The case is therefore submitted without oral argument.

Defendant was charged in a four-count indictment with one count of conspiring to defraud the Internal Revenue Service, in violation of 18 U.S.C. § 371, and three counts of aiding and assisting in the preparation of false and fraudulent tax returns, in violation of 26 U.S.C. § 7206(2). A jury found him guilty on all four counts. After his motion for Judgment in Spite of Jury Verdict was denied, the district court sentenced Defendant to seventy months' incarceration.

**Factual Background**

Defendant was a promoter of "trust" schemes designed to thwart the tax laws. The conspiracy and false tax return charges of which Defendant was convicted arose from his dealings between 1993-1997 with the Reed family (brothers Chuck and Steve, and sisters Kristen Reed Seidelmann and Roi Delene Reed Jacobs) and their family-owned business, Nuway, Inc. Nuway specialized in corporate catering, and in providing meal and shower service to U.S. Forest firefighters. Nuway had originally been a restaurant owned by the Reeds' father but rapidly expanded during the 1970s and 1980s. By 1992, Nuway, still

operating as a family-owned corporation based in Wyoming, was providing meals and showers to U.S. Government firefighters all over the United States. The corporation was owned in equal twenty-five percent shares by the four Reed siblings.

In the early 1990s, Chuck Reed had become hostile to the IRS. Defendant met Chuck at a meeting of a tax protestor organization known as The Pilot Connection Society. Chuck invited Defendant to visit the Reeds in Wyoming and give them a presentation on setting up trusts. Defendant explained how the Reeds could change the family business from a corporation to a "trust" and thereby obtain privacy, asset protection from lawsuits, and tax benefits. The Reeds decided to follow Defendant's advice and, with his technical expertise, executed a business trust known as Nuway Management Trust. They also established trusts for each of the mobile kitchen and shower units. These smaller trusts leased their property to the larger Nuway Management Trust which managed the cash flow from the subordinate trusts and facilitated equipment loans from one to another. The Reeds then formally dissolved Nuway, Inc., by filing articles of dissolution with the Secretary of the State of Wyoming.

Defendant agreed to serve as the trustee for Nuway Management Trust and the subordinate kitchen and shower trusts, although he had nothing to do with the daily operations or decision-making of the entities. In his capacity as trustee,

Defendant would pre-sign checks to be drawn on the trusts' checking accounts. None of the Reeds' responsibilities or authority changed after Nuway's reorganization; they did not relinquish control of the business.

Defendant also helped the Reeds organize their personal finances. He recommended that they establish individual trusts, into which they would transfer title to their homes and cars and personal property such as furniture, tools, antique automobiles, and housewares. Defendant explained to the Reeds that all that was required to protect these assets was to transfer title into the trusts and register the conveyance with the county court or recorder of deeds. The transfer of ownership would not require even the formality of a sale; the trusts would not have to pay money for the assets that they were acquiring. The Reeds followed Defendant's plan and established these personal trusts. The personal trusts were identified by federal tax numbers and not the social security number of the individual establishing the trust. They selected close personal friends or Defendant to serve as trustees, and the Reeds themselves served as managers of their trusts, making all of the decisions that affected trust assets.

The personal trusts reduced the Reeds' income liability by allowing the Reeds to divert approximately fifty percent of their earnings into their personal trusts and claim substantial expenses for operating them. Defendant advised that the only expenses that would not qualify for a tax deduction were groceries,

entertainment, clothing, and education. Thus, the Reeds funneled large portions of their Nuway income into their personal trusts accounts, where it was used for "deductible" operating expenses, such as gas, electric, and telephone bills; home mortgage payments; auto insurance, repairs and maintenance; monthly installment payments for their cars; property taxes; and home improvements and repairs.

In addition to serving as trustee for Nuway and for a number of the Reeds' personal trusts, Defendant agreed to prepare income tax returns for the trusts and for the Reeds. The Reeds paid Defendant for setting up the trusts, for his services as trustee, and for preparing their income tax returns. Defendant's scheme appeared to yield the promised tax benefits. By funneling wage and salary income from Nuway into their personal trusts, the Reeds all reported substantially less income.

Defendant also came up with a plan that enabled Nuway to evade paying taxes on its earnings–which amounted to $2,187,673 in 1994. He recommended the establishment of an offshore charitable trust to which the Reeds could make a generous donation. To this end, Defendant prepared a distribution of $2,187,673 to an Austrian company named Crystal Diversified (thereby reducing Nuway's reported 1994 tax liability to zero). (Defendant had established Crystal Diversified for the use of one of his former clients.) Next, Defendant assisted the Reeds in setting up a bank account in Isle of Man into which the Reeds wired

$500,000. Defendant then transferred these funds to the Austrian Crystal Diversified account. Finally, in 1996, Defendant began repatriating the funds from Austria for the Reeds. Defendant testified that he had received payment for his services from the various Austrian entities through which the Nuway funds were repatriated. The Reeds asked Defendant to prepare their 1995 tax return. In addition, they invited Defendant to Wyoming to speak with other individuals interested in trusts.

Eventually, IRS agents visited Nuway after unsuccessfully attempting to contact Defendant. The Reeds were required to file amended tax returns and pay back taxes. They also pleaded guilty to various tax crimes. Defendant was charged in a separate indictment. Defendant argues that his conviction must be vacated because of errors in limiting his cross-examination of witnesses, presentation of false testimony, improper impeachment evidence, and inadequate jury instructions.

## Limitation of Cross-Examination

Defendant argues that his conviction must be vacated because he was not allowed to cross-examine Marilyn Reed (wife of Steve), one of the prosecution's witnesses, regarding her acquaintance with a man named Eddie Kahn.

A district court's evidentiary rulings are ordinarily reviewed for abuse of discretion, *see United States v. Janusz*, 135 F.3d 1319, 1323 (10th Cir. 1998),

although when the trial court's evidentiary ruling implicates the Confrontation Clause of the Sixth Amendment, and the issue was preserved for appeal, we will review the asserted violation de novo. *See United States v. Joe*, 8 F.3d 1488, 1492 (10th Cir. 1993). But where an appellant has failed to preserve the issue at the trial court level, we will review the district court's ruling only for plain error. *Janusz*, 135 F.3d at 1322.

Defendant complains that the district court prevented him from cross-examining Ms. Reed about Mr. Kahn's advice concerning filing tax returns. After counsel raised this issue during cross-examination, the prosecution objected that the matter was beyond the scope of direct. Asked by the district court whether the matter had some connection to the direct examination of Ms. Reed, counsel responded only, "[w]ell, it has a connection to some things as to credibility. It deals with the 1996 tax returns." Rec., Vol. 1, at 27. When the district court replied that it was beyond the scope of direct, defense counsel received permission from the court to take a minute's pause, after which counsel remarked, "I don't have anything further." *Id*.

Defendant did not reveal to the district court the theories of relevance he now urges. In this appeal, Defendant claims that had he been able to cross-examine Ms. Reed regarding Mr. Kahn, he would have placed her credibility in doubt and shown that it was Mr. Kahn, not Defendant, who persuaded the Reeds

not to file tax returns. But Defendant did not make anything other than a mere assertion that the Mr. Kahn materials had "a connection to some things as to credibility" and dealt "with the 1996 tax returns," to the district court. Rec., Vol. 1, at 27. Moreover, after the court's conclusion that the Mr. Kahn matter was beyond the scope of direct, Defendant failed to make an offer of proof in accordance with Fed. R. Evid. 103(a)(2) despite his opportunity to do so.

The proponent of excluded evidence does not satisfy his burden to make an offer of proof merely by telling the trial court the content of the proposed testimony. *See United States v. Brown*, 540 F.2d 1048, 1053 (10th Cir. 1976). Rather, the proponent "must explain what [he] expects [the evidence] to show and the grounds for which the party believes the evidence to be admissible . . . ." *Polys v. Trans-Colorado Airlines, Inc.*, 941 F.2d 1404, 1407 (10th Cir. 1991) (internal quotation and citations omitted). Since Defendant did not tell the district court the content of the Mr. Kahn evidence, we will review the district court's exclusion of that evidence for plain error only. *See Janusz*, 135 F.3d at 1323.

Under the plain error test, there must be (1) an error (2) that is plain and (3) that affects substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993); *Janusz*, 135 F.3d at 1322. Even if all three elements are present, we may exercise discretion to notice the forfeited error only if the error seriously affects the

fairness, integrity, or public reputation of judicial proceedings. *Olano*, 507 U.S. at 732; *Janusz*, 135 F.3d at 1322.

Defendant has not demonstrated that the district court erred in limiting the questioning of Ms. Reed about Mr. Kahn. There is nothing in the record which supports defense counsel's allegation that such testimony would reveal that Defendant was not involved in the filing of the Reeds' tax returns. When a defendant has not made a timely and sufficient proffer of the substance of the evidence, we are hindered in applying the plain error test. "A full record and a prior decision in the district court are essential ingredients to our substantive review of issues–they flesh out an issue in a way the parties' briefs may not." *United States v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998).

Even if there was error, Defendant has not shown that the error was plain. An error is made plain only if it is "clear or obvious" or "contrary to well-settled law" (e.g., the Supreme Court has addressed the issue). *See United States v. Dowlin*, 408 F.3d 647, 669 (10th Cir. 2005). This is not the case here.

Defendant has also failed to show that the alleged error affected substantial rights or the outcome of his trial. The value of the Mr. Kahn matter in clearing Defendant is dubious; apart from the government's evidence admitted against him, Defendant also made inconsistent statements about his role in the formation of Crystal Diversified. In addition, had Defendant wanted to expose the alleged

relationship between Ms. Reed and Mr. Kahn, Defendant could have called Ms. Reed as his own witness. Consequently, we do not determine that the district court erred in limiting the cross-examination of Ms. Reed.

## Cross-Examination of Accused

Defendant argues that the district court erroneously allowed the prosecutor to cross-examine him about his failure to file his personal (individual) tax returns for the years 1992-1998.

We review for abuse of discretion the extent to which a district court allows cross-examination of an accused. *See Speers v. United States*, 387 F.2d 698, 703 (10th Cir. 1967) (noting that wide latitude is permitted in cross-examination of an accused when a prosecutor seeks to impugn a defendant's credibility).

Although Defendant couches his argument in terms of the allegedly erroneous admission of evidence under Federal Rule of Evidence 404(b), that rule is only tangentially related to the allegation of error here. The dispositive issue is the proper scope of cross-examination. Under Federal Rule of Evidence 611(b), cross-examination "should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." When an accused testifies in his own case-in-chief, he waives his privilege against self-incrimination, a waiver that subjects him to cross-examination on all "relevant

-10-

facts." *Johnson v. United States*, 318 U.S. 189, 195 (1943) (citation omitted). In particular, when a defendant makes a false statement during direct testimony, the prosecution is allowed to prove, either through cross-examination or by rebuttal witnesses, that the defendant lied as to that fact. *See, e.g.*, *Walder v. United States*, 347 U.S. 62, 65 (1954). This is so even if the evidence elicited by the prosecution ordinarily might be collateral or otherwise inadmissible. *Id.* This principle of cross-examination is known as the doctrine of "specific contradiction." *See, e.g.*, *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1456 (10th Cir. 1997) (citing *United States v. Greschner*, 802 F.2d 373, 383 (10th Cir. 1986)).

Defendant testified on his own behalf, and during his direct examination his counsel inquired whether the Reeds had ever asked Defendant to help them cheat on their taxes. Defendant responded that they had not. Counsel asked how Defendant would have responded in the event that the Reeds had ever made such a request. Defendant answered that he would never advise or assist anyone in that endeavor.

During cross-examination, Defendant conceded that he had assisted individuals in preparation of trusts and had earned income from that endeavor. The prosecutor asked whether Defendant filed personal federal income tax returns, and the defense counsel objected on relevance grounds. The prosecutor

argued that Defendant's filing history was relevant to his credibility. The district court overruled the objection, and the prosecutor asked whether Defendant had filed his federal income tax returns for the years 1992-1998. Defendant answered that he had not. Counsel for Defendant elected not to ask questions on redirect.

Defendant now argues that, because the prosecutor made no attempt to show that he had sufficient income and was consequently required by law to file form 1040 for the years 1992-1998, the evidence had no probative value and was irrelevant to any issue in the case. But the record does contain evidence–both from the government's case-in-chief and from defendant's own testimony–to support the inference that Defendant received adequate income to require him to file tax returns for the years in question.

Thus, when Defendant answered that he had not filed individual income tax returns, the jury was entitled to infer from all of that evidence that Defendant had failed to file tax returns for the years 1992-1998 despite having had an obligation to do so. *See Caminetti v. United States*, 242 U.S. 470, 494 (1917) (explaining that "where the accused takes the stand in his own behalf and voluntarily testifies for himself[,] . . . he may not stop short in his testimony by omitting and failing to explain incriminating circumstances and events already in evidence . . . without subjecting his silence to the inferences to be naturally drawn from it"). Under the doctrine of specific contradiction, the district court did not abuse its discretion

-12-

when it allowed Defendant to be questioned about his failure to file federal income tax returns. *See, e.g.*, *Walder*, 347 U.S. at 66; *Mason*, 115 F.3d at 1456.

## Jury Instructions

Defendant argues that his 26 § U.S.C. 7206(2) convictions must be reversed because of the district court's refusal to give jury instructions regarding grantor trust provisions of the Internal Revenue Code.

We review a district court's refusal to give a requested instruction for abuse of discretion. *United States v. Gonzalez-Montoya*, 161 F.3d 643, 651 (10th Cir. 1998). In assessing whether the district court exercised its discretion properly, we review the jury instructions de novo to determine whether, as a whole, they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case. *United States v. Pacheco*, 154 F.3d 1236, 1238 (10th Cir. 1998).

A defendant is entitled to an instruction on his theory of the case if the instruction is a correct statement of the law, and if he has offered sufficient evidence for the jury to find in his favor. *See Gonzales-Montoya*, 161 F.3d at 651. Here, Defendant sought jury instructions relating to 26 U.S.C. §§ 671, 673, 674, 676, 677, and 678. These sections pertain to the treatment of trusts–specifically, that grantors of trusts may be considered owners of the trusts and include the trusts in the computation of individual taxable income.

-13-

In his case-in-chief, Defendant elicited expert testimony from Ralph J. Gines, a tax attorney, certified public accountant, and professor of accounting and tax law. Mr. Gines testified that, based on his review of the individual, corporate, and trust tax returns admitted into evidence, he did not believe that the charged 1995 individual income tax returns understated the taxpayers' income as alleged in Counts Two through Four of the indictment. He based his opinion on the theory that the losses of Nuway Management Trust could be passed on to the Reeds individually, so as to offset income on their tax returns.

Based on this testimony, Defendant submitted proposed jury instructions that essentially recited Internal Revenue Code Sections 671 and 673-78. The district court heard argument on the proposed instructions and declined to include them. In this appeal, Defendant contends that the indictment

> alleges trust characteristics, which cause [Internal Revenue Code Sections 671, 673-78] to govern the taxation of the trusts at issue in this case . . . . The result of the application of the Internal Revenue Code to the allegations of the indictment is clear that the Reed family members are to be treated as owners of their respective trusts.

Aplt. Br. at 40-41.

Decisions regarding the law are for the court, not expert witnesses. *See*, *e.g.*, *Specht v. Jensen*, 853 F.2d 805, 810 (10th Cir. 1988) ("In no instance can a witness be permitted to define the law of the case."). Thus, Mr. Gines' testimony that Section 671 could be applicable was not enough to require an instruction.

-14-

The factual evidence presented at trial did not provide an evidentiary foundation for the instruction.

In particular, the Reeds testified that there was no difference of any significance between Nuway, Inc., and Nuway Management Trust. They also admitted that Nuway Management Trust and the personal trusts had been established to perpetrate a tax fraud. Consequently, for purposes of tax law, Nuway, Inc., did not disappear. "A trust having the attributes of a corporation will be treated for federal income tax purposes as an association and thus cognizable as a taxable entity." *United States v. Sabino*, 274 F.3d 1053, 1068 (6th Cir. 2001) (rejecting defendants' contention that corporation they "reorganized" as a "trust" did not exist, because it had been dissolved under state law). "A corporation is subject to federal corporate income tax liability as long as it continues to do business in a corporate manner, despite the fact that its recognized legal status is voluntarily or involuntarily terminated." *Messer v. Comm'r*, 438 F.2d 774, 778 (3d Cir. 1971). Accordingly, given the undisputed evidence that throughout the prosecution period Nuway never changed the substantive nature of its business operations, Nuway, Inc., remained taxable as a corporation for federal tax purposes even after the filing of its dissolution notice in March 1994. *See Sabino*, 274 F.3d 1068-69. Thus, there was no basis for a finding that the business losses flowed through to the Reeds, and the district court

did not abuse its discretion when it refused Defendant's proposed jury instruction.

Defendant contends that, by focusing its proof on the Reeds' understatement of wage and salary income on line seven of their 1995 1040s instead of line twenty-two, the line specified in the indictment, the government created a fatal variance between its evidence and the charged offenses.

If the district court's instructions and the proof at trial broaden the indictment, the variance constitutes a constructive amendment, violates the Fifth Amendment, and is reversible per se. *United States v. Wright*, 932 F.2d 868, 874 (10th Cir. 1991). We review de novo whether a variance existed and whether it was fatal. *United States v. Williamson*, 53 F.3d 1500, 1512 (10th Cir. 1995).

Line twenty-two of the IRS Form 1040, United States Individual Income Tax Return (the tax form on which Counts two through four of the indictment are based) reads as follows: "Add amounts shown in the far right column for lines seven through twenty-one. This is your total income." Given that line twenty-two is derived arithmetically from the other lines, the understatement of line seven wage and salary income automatically caused line twenty-two total income to be understated. *See, e.g.*, *United States v. Reynolds*, 919 F.2d 435, 437 (7th Cir. 1990).

The government introduced ample evidence of the falsity of line seven and therefore line twenty-two with regard to each of the charged tax returns. In its

case-in-chief, the government established that, pursuant to Defendant's directions, on their 1995 1040s, Chuck Reed (Count Two), Steve and Marilyn Reed (Count 3), and Roi Delene Jacobs (Count 4) all deliberately understated their line seven wage and salary income by causing Nuway to assign large portions of it to their respective personal trusts. The Reeds admitted this misconduct and testified that they had to file amended tax returns and pay back taxes as a result.

The government's proof established the falsity of line seven, and, by arithmetical derivation, of line twenty-two as well. The jury was instructed that in order to convict Defendant of violating Section 7206(2) it had to find that he had willfully aided and assisted in the preparation or presentation of an income tax return on which line twenty-two was falsely and fraudulently understated. Under these circumstances, we do not determine that there was significant difference between the proof and the indictment.

### Witness' Grand Jury Testimony

Defendant alleges that the prosecutor presented perjured testimony to the grand jury and that the indictment should have been dismissed. In particular, he asserts that the district court erred by declining to dismiss the indictment without first examining the entire record of the grand jury proceedings.

We review de novo a trial court's determination of whether a prosecutor's alleged misconduct before the grand jury warrants dismissal of the indictment.

-17-

*United States v. Kilpatrick*, 821 F.2d 1456, 1467 (10th Cir. 1987). When the basis of the alleged misconduct amounts to a technical violation–affecting only the grand jury's finding of probable cause–the defendant must have successfully challenged the indictment before the petit jury returns the verdict. *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1245 (10th Cir. 1996). A guilty verdict that is supported by the evidence "not only establishes there was probable cause to believe that the defendant was guilty as charged[ ] but also that the defendant was guilty beyond a reasonable doubt." *Id*. (citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986)).

Defendant alleges that Marilyn Reed committed grand jury perjury when she testified that Defendant and the Reeds planned to bring back the $500,000 in offshore Nuway funds in increments smaller than $10,000 to avoid notifying the IRS. Defendant juxtaposes this grand jury testimony with Ms. Reed's trial testimony in which she demonstrated that the Reeds recovered the offshore funds in seven transactions, all but one of which were in amounts much larger than $10,000.

The district court denied Defendant's motion to dismiss the indictment after hearing argument. We agree with the district court's action as Defendant has failed to establish that Ms. Reed uttered a false statement. *See United States v. Wolny*, 133 F.3d 758, 762 (10th Cir. 1998). In the first place, it is not obvious

that Ms. Reed's testimony to the grand jury and at trial are contradictory: her grand jury statements may be taken to show only a plan to repatriate the funds in increments smaller than $10,000 rather than the execution of such fund transfers. Second, even if Ms. Reed's statements were considered false, Defendant has failed to demonstrate any deliberate attempt by the prosecution to unfairly sway the grand jury. Where we have called admittedly false statements "technical," we have affirmed the district court's denial of a motion to dismiss the indictment when a defendant failed to establish that false statements before a grand jury were deliberate. *See Lopez-Gutierrez*, 83 F.3d at 1245. Thus, the district court properly denied Defendant's motion to dismiss the indictment.

Defendant asserts that the prosecutor knowingly elicited false testimony from Roi Delene Reed Jacobs "to the effect that she received no benefit in exchange for [her] plea agreement, which included an agreement to testify against defendant . . . ." Defendant argues that the prosecutor's conduct establishes a due process violation under the rule of *Napue v. Illinois*, 360 U.S. 264 (1959), and he contends that the district court committed reversible error in denying his motion for mistrial or "corrective instruction" at the conclusion of Ms. Jacobs' testimony.

A district court's denial of a motion for mistrial is reviewed for abuse of discretion. *United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001). When seeking a mistrial based on the government's alleged use of perjured

testimony, the movant must establish that (1) the testimony at issue was false, (2) the testimony was material, and (3) the prosecutor nevertheless knowingly and intentionally relied on the testimony. *Wolny*, 133 F.3d at 762. If there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required. *Knighton v. Mullin*, 293 F.3d 1165, 1174 (10th Cir. 2002). However, the movant does not sustain his burden of demonstrating perjury merely by proving that a government witness has testified falsely or has given testimony that conflicts with other statements. *See Smith v. Roberts*, 115 F.3d 818, 820 (10th Cir. 1997). Where evidence refuting a false statement is revealed in cross-examination, the government cannot be said to have relied on the false direct-examination testimony to obtain a guilty verdict. *See United States v. Langston*, 970 F.2d 692, 701 (10th Cir. 1992).

Ms. Jacobs' testimony could be attributed to a cooperating witness's difficulty understanding the terms of her own plea agreement and her possible confusion answering questions on cross-examination:

Q. As part of your plea agreement, did you agree to testify against [Defendant]?

A. No.

Q. You didn't? Did you enter into a plea agreement?

A. Yes.

Q. Could I have permission to approach the witness?

The Court: Sure

Q. Could you – is that the plea agreement that you entered into?

A. Yes.

. . . .

Q. So did you agree to testify against [Defendant]?

A. Yes.

Rec., Vol. 1, at 37-38. There has been no showing of deliberate false testimony. It is clear from the record that Ms. Jacobs was confused about her obligation to testify against Defendant. She may have understood the inquiry to relate to benefits other than those she had already received. Defendant has not met his burden of showing that the testimony was false. In addition, Defendant has ignored the record evidence that his counsel elicited testimony from Ms. Jacobs to the effect that she had signed a plea agreement and agreed to testify against Defendant. Moreover, had Defendant wished to cross-examine Ms. Jacobs further, he was armed with the necessary information.

Last, Defendant's assertion that the government violated the due process principles of *Napue v. Illinois*, 360 U.S. 264 (1959), ignores the factual distinction between that case and the instant case. In *Napue*, the unfairness of the government's conduct stemmed from a two-step process: first, the failure to

-21-

disclose the exculpatory evidence of a plea bargain with the prosecution; and second, the exploitation of that failure by the presentation of evidence or testimony the falsity of which would have been obvious but for the nondisclosure. *See Napue*, 360 U.S. at 267 n.2, 270-71. In the instant case, however, Defendant had the plea agreement to use when cross-examining Ms. Jacobs. The government had disclosed this impeachment evidence and hence *Napue* is inapposite. Therefore, the district court did not abuse its discretion when it denied Defendant's motion for a mistrial or when it refused Defendant's request for an instruction that Ms. Jacobs had testified falsely.

**Cumulative Effect of Harmless Error**

Defendant also submits that his conviction must be vacated even if the trial errors taken individually were harmless because the cumulative effect of the errors denied Defendant a fair trial.

"A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990). As to the claims that Defendant has presented us with, we have found neither error nor harmless error. Therefore, we must refrain from engaging in a cumulative analysis. *Id*. ("[A]

-22-

cumulative-error analysis aggregates only actual errors to determine their cumulative effect.")

## Sentencing

Defendant challenges his sentence under the Federal Sentencing Guidelines ("Guidelines"). The legality of the Guidelines is a question of law which we review de novo. *United States v. Leach*, 417 F.3d 1099, 1105 (10th Cir. 2005).

Defendant argues that his "sentence must be vacated and the case remanded for sentencing because the District Court's use of the mandatory Federal Sentencing Guidelines violated [his] Sixth Amendment rights . . . ." Aplt. Br. at 50. The government has suggested and we agree that Defendant's sentence should be vacated and the case remanded for resentencing in accordance with the Supreme Court's decision in *United States v. Booker*, __ U.S. __, 125 S. Ct. 738 (2005).

Defendant also argues that giving the Guidelines a high level of deference on remand would violate his Sixth Amendment rights by de facto making the Guidelines mandatory. However, *Booker* instructs that trial courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 125 S. Ct. at 767. Further, the opinion indicates that trial courts must accord deference to the Guidelines: "These features of the remaining system, while not the system Congress enacted, nonetheless continue to

move sentencing in Congress' preferred direction, helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary." *Id.* Thus, we decline Defendant's invitation to dilute the influence of the Guidelines upon remand of his sentence.

Finally, Defendant asserts that "the District Court should be instructed that all sentencing facts used to determine the advisory Guidelines range must be established by proof beyond a reasonable doubt." Aplt. Br. at 57. But the Supreme Court in *Booker* did not hold or imply that every sentencing fact must be found beyond a reasonable doubt. The Supreme Court did not address the standard of proof except with respect to a "fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict"; such a fact "must be admitted by the defendant or proved beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. Furthermore, we have held that the correct standard for findings under the Guidelines is the preponderance of the evidence. *United States v. Frederick*, 897 F.2d 490, 492-93 (10th Cir. 1990). Under an advisory Guidelines regime, a conviction, by itself, authorizes a sentence up to the statutory maximum. Thus, the facts guiding the district court's exercise of discretion need not be found beyond a reasonable doubt.

We therefore **AFFIRM** the district court's judgment on all issues except

that we **REMAND** for resentencing in accordance with this opinion.